McCREARY v. BURNS.

1. The provisions of a will were: "I desire that the land and other property remaining shall continue in the possession of my beloved wife L. during her life, believing she will make use of it to the best advantage for the benefit of our children as well as her own comfort. At her death, I wish the property sold and an equal division made. If it should be deemed advisable by the executors to dispose of or exchange the property, I authorize them to do so, having confidence that they will in all things consult the best interest of the family." The widow was executrix. *Held*, that under the will construed as a whole L. took only a life-estate, with no power of consuming the *corpus* and without any trust during her life, enforceable by the courts, in favor of the children.

2. To action brought after the widow's death for partition of this property, the personal representative of the widow is not a necessary party.

3. A tract of land purchased with money realized from the sale by L. of the lands included in this devise is governed by the terms of this will, even in the hands of a remainderman who took titles in his own name, but with full knowledge of the facts.

4. There was nothing in this will which empowered the widow to pay to her sons, for services rendered in keeping up the place and family, any part of the purchase-money of the lands sold.

5. Under complaint for a partition of the substituted land, demanding also an accounting, the decree may order one of the co-tenants to refund, out of his share, a part of the purchase-money of the first tract received by him.

6. The only child of one of testator's daughters, who died after testator, is entitled to her mother's vested interest in the remainder, and may, after the death of the life-tenant, bring action for partition.

7. In such action she cannot be required to account for maintenance gratuitously extended to her in childhood by her maternal grandmother and uncle.

8. The statute of limitations did not begin to run against plaintiff's action

until the death of the life-tenant, even though plaintiff may have known of the claim made by her uncle to the substituted land.

9. But the other remaindermen, who agreed to the arrangement by which titles were made to two sons of the life-tenant, should not now be permitted to disturb it.

10. The rule governing accounting between tenants in common for rents and profits, as declared in *Jones* v. *Massey*, 14 *S. C.* 292, approved.

Before KERSHAW, J., Anderson, February, 1881.

Action for partition and account instituted by Alice J. McCreary against Thomas Burns, Robert Burns, and others, devisees and heirs at law of Anderson Burns, deceased. The opinion states the case.

Messrs. *Murray & Murray*, for appellants.

Mr. *J. L. Trimble*, contra.

April 5, 1882. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. Anderson Burns died in 1846, possessed of a small tract of 140 acres of land and some personal property. He left eight children, all minors, six daughters and two sons, viz., Maria Burns, Robert Burns, Thomas Burns, Nancy Stephens, Harriet Hunt, Hester Rochester, and Mary Reese (who has died since, leaving distributees, John Reese, Lucy Woolbright, and Sidney Reese, now also dead, leaving heirs in Virginia whose names are not known), and also *Sarah Grogan*, who died after the death of her father, but before her mother, leaving as her sole heir Alice J. Grogan, who intermarried with L. C. McCreary.

The deceased left a will, of which his widow Leah was the sole qualified executrix, and which provided as follows: *First.* I wish as soon as convenient that my debts, of which there are not many, shall be paid. *Secondly.* I desire that the land and other property remaining shall continue in the possession of my beloved wife, Leah Burns, during her life, believing she will make use of it to the best advantage for the benefit of our children—as well as her own comfort. *Thirdly.* At her death I wish the property sold and an equal division made, except

that the sons, none of whom have had the advantages of education, shall each have one hundred dollars over and above an equal distributive share, and each of the daughters now under ten years of age (three) to have fifty dollars over and above an equal distributive share. If, as I expect, another should be added to the number either of boys or girls, I wish it included in the provisions of this clause. *Fourthly.* If it should be deemed advisable by the executors to dispose of or exchange the property, I authorize them to do so, having confidence that they will in all things consult the best interests of the family.

The widow alone qualified. There were some but not many debts. The family continued to live on the place. The mother and the two sons managed, and by the work of all the family was barely supported. As the children grew up they married and moved off. *Robert* remained *four years* after he came of age before he married prior to 1860. When he left, his mother gave him her note for $400 for his services after he came of age. Afterwards she conveyed 40 acres of the land to pay this note, but when she was about to sell the land he reconveyed to her, still retaining her note. After Robert left, *Thomas* became the head of the family, remaining with his mother, giving his labor and being clothed and supported for thirteen years after he came of age.

In May, 1869, having incurred some debts, and among them that to Robert, Mrs. Burns sold the homestead to one E. G. Roberts for $2000 in currency, which was reduced somewhat by being brought to a gold basis, and on July 5, 1880, another tract of land was purchased from one Alonzo J. White for $1000, the titles of which were made to *Thomas Burns.* To this place the family removed, then consisting of Mrs. Burns, Thomas, and Maria (who had never married), and the granddaughter, Alice J. Grogan, whose mother had died years before, and who had been reared from infancy by her grandmother. Thomas conveyed 100 acres of the land to Robert, who now lives on it. Alice Grogan married and went off, and things remained in this general condition *until* 1876, *when the widow, Mrs. Burns, died.* There has been no administration upon her estate.

*In* 1879 Alice J. McCreary instituted these proceedings, alleging that the White tract of land now in possession of Thomas and Robert was *paid for* with the proceeds of the sale of the homestead, and therefore falls under the provisions of the will and is subject to partition among the brothers and sisters and the children of those who have died since the testator. Thomas and Robert answered in substance that Mrs. Burns, by authority of the will, had directed titles made to Thomas, with the consent of the other children, *in payment* for his long and faithful services to her and the family, and that there was no estate to divide. The case came on to be heard before Judge Kershaw, who decreed that under the will Mrs. Burns was simply a *tenant for life*, and as such trustee for the remaindermen ; that the White place had been purchased with proceeds of the sale of the homestead and was subject to partition. He directed a sale, and ordered an account of the rents and profits since the death of Mrs. Burns, and also ordered that Robert should pay back $400 of the purchase-money which he got in satisfaction of the note his mother had given him, as stated, for his services.

Thomas and Robert appeal to this court upon the exceptions : I. " That under the will Mrs. Burns was not merely a life-tenant, holding the property in trust for the children at her death, but entrusted with it for the benefit of herself and children, with a superadded power to sell and dispose of the property as would be most conducive to their best interest.

II. " That the testimony does not show that more than $500 of the proceeds of the homestead were invested in the tract of land purchased by Thomas Burns.

III. " That the decree that Robert Burns should pay $400 was not asked for in the complaint, and was a surprise, and all the facts in regard to the transaction not inquired into either by the plaintiff's or defendants' counsel.

IV. " That Alice J. McCreary, the sole plaintiff, having received, as shown by the testimony, far more than her distributive share of the estate, even if she was entitled to anything, is estopped in equity and conscience from her present unconscionable demand.

V. "That Alice J. McCreary, the sole plaintiff, being *a granddaughter* of the testator, has no interest under the will of the testator, and therefore cannot maintain this action.

VI. "That the action has been prematurely brought, no administration upon the estate of Leah Burns, deceased, having been taken, nor any decree fixing her liability, nor evidence showing the inability of her estate to respond to any demand against it, growing out of the trust estate.

VII. "That the statute of limitations is a bar to the recovery of the plaintiff, as the deed to Thomas Burns was made and recorded more than six years previous to the institution of this or any other action to impair its validity, and the circumstances connected with the purchase of said tract of land were known to the plaintiff at the time of the purchase."

The fundamental rule prescribed for the construction of wills is that the intention of the testator, to be collected from the whole will, must govern, and that if possible it must be so construed that the whole must stand together and effect be given to every provision in it. What was the intention of Burns the testator? Did he mean to give his little property to his wife to use and enjoy during her life, paying his debts and rearing his family upon the usufruct alone, and at her death the whole *corpus* to go over to his children—in other words, to make her simply a tenant for life with limitation over to the children; or did he intend to give his property to his wife in trust for herself and children, not only with the right to use it, but with the power to dispose of it, to consume it in the use, to spend it all if necessary in rearing his family? If the latter, it would be necessary that the representative of Leah, the trustee, should be made a party to account for the property and to show whether it was necessary to sell it, and also whether the proceeds of sale were properly and necessarily spent in the support and maintenance of the family. But if the former, the ordinary principles as between tenant for life and remainder-man must be applied.

The first part of the second paragraph of the will undoubtedly gives a simple life-estate to Leah. There is no direct gift in terms, but being in a will the word "desire"

means that. If the clause had stopped there, no doubt could exist that she took a life-estate pure and simple; but these words were added: "believing she will make use of it to the best advantage for the benefit of our children as well as her own comfort." Should these words change the construction of the clause so as to make Leah a trustee of the property "for the benefit of the children," giving them an equitable charge on it during her life for their support, or were they simply expressions of faith intended to stimulate the discretion given to her?

With some hesitation we concur with the Circuit judge in taking the view that Leah Burns was simply a life-tenant, and as such trustee of the property for the children as remaindermen. No such trust for the children was created in Leah during her life, as the court would compel her to execute. The purposes were too vague and uncertain, and the word "believing" was not intended to be more than *precatory*.

Without going into the numerous authorities upon the subject, we content ourselves by citing the remarks of Mr. Justice Story: "The doctrine of construing expressions of recommendation, confidence, hope, wish and desire into positive and peremptory commands, is not a little difficult to be maintained, upon a sound principle of interpretation of the actual intentions of a testator. It can scarcely be presumed that every testator should not clearly understand the difference between such expressions and words of positive direction and command, and that in using the one and omitting the other he should not have a determined end in view. It will be agreed on all hands, that when the intention of the testator is to leave the whole object, *as a pure matter of discretion*, to the free-will and pleasure of the party enjoying his confidence and favor, and when his expressions of desire are entrusted as mere moral suggestions to excite and aid that discretion, *but not absolutely to control and govern it*, then the language cannot and ought not to be held to create a trust. Now, words of recommendation and others precatory in their nature imply that very discretion as contradistinguished from peremptory orders, and therefore ought to be so construed, unless a different sense is

irresistibly forced upon them by the context. Accordingly, in more modern times a strong disposition has been indicated not to extend this doctrine of recommendatory trusts, but as far as the authorities will allow, to give to the words of wills their natural and ordinary sense, unless it is clear that they are designed to be used in a peculiar sense." 2 *Story Eq.*, § 1069; *Harding* v. *Glynn*, 2 *White & Tudor's Equity Cases*, 1833, and notes; *Lesesne* v. *Witte*, 5 *S. C.* 450.

The fourth clause is not in conflict with the construction that Mrs. Burns was a tenant for life of the property. In that the testator "having confidence that they will in all things consult the best interest of the family" gives to the *executors* the power "to dispose of or exchange the property as they think most advisable." We cannot suppose that by this he meant that the *executors* might dispose of the property, in the sense of *consuming* or *spending* it without accountability for the proceeds. That view is negatived by the words which follow in the same connection "or exchange." The third clause is in harmony with this construction, for it presupposes that the property will remain unexpended at the death of Leah, and in that event provides that "the property shall be sold and equal division made," etc.

The determination that Leah Burns took simply a life-estate substantially disposes of most of the other questions in the case. The principle is well established that the tenant for life is a trustee for the remaindermen, and, whilst entitled to the use, must preserve the estate in the same general condition in which he received it. The execution of the power given conferred a good title on the purchaser, and the purchase-money constituted the estate, and "so long as it can be traced and distinguished it will inure to the benefit of the *cestui que trusts*, and all claims of the creditors of the trustee must be postponed until the trust is discharged." *McNeil* v. *Morrow*, *Rich. Eq. Cas.* 172; 2 *Wait A. & D.* 449.

The homestead place was sold to E. G. Roberts for $2000 in currency—something less when reduced to a gold basis. What became of the money? It appears with reasonable certainty that $1000 went to pay for the White place. Mr. Gail-

lard says that as the agent of White he sold the place. Thomas Burns asked him if it was for sale, and Cyrus Stephens, a son-in-law of Mrs. Burns, came and made the purchase. He paid $500 cash and gave a note of E. G. Roberts for $500, payable to Mrs. Burns as *executrix.* This made the purchase-money $1000. Another portion of the purchase-money, $400, was paid to Robert in liquidation of the note before referred to as given to him by his mother for services rendered before he married. It does not appear what became of the remainder of the purchase-money. The White place then became part of the *corpus* of the estate.

It is claimed, however, that at least $500 of the purchase-money was paid to Thomas by his mother, by virtue of her large powers under the will, for his long and faithful services in charge of her business and family. It really does seem as if in justice he should receive more than his equal share as compensation for his services. All agree that he was industrious, close, and faithful. No doubt the mother wished to compensate him, and most of his brothers and sisters seem willing that he should have it. But in strict law, according to the proper construction of the will, Mrs. Burns had no right to receive services and pay for them out of the *corpus* of the estate. She and her family were entitled merely to the *usufruct,* which was her only means of paying debts. Thomas chose to stay with her, and possibly he may have been compensated in the comfortable living he received or by the surplus of crops which he controlled; but if not it is his misfortune.

The same may be said as to Robert and the $400 of the purchase-money he received. In reference to him it is said that the complaint only asked partition of the White tract of land as part of the *corpus* of the estate, and the decree against Robert for the money cannot stand, as there is nothing in the complaint to sustain it. It is true the complaint did not specifically state this matter, for the reason probably that it was not known; but Robert was a party. He admitted that he got the money, and the third paragraph of the prayer for judgment did ask " that an accounting be had before W. W. Humphreys, master." This was enough to cover this particular matter as

an incident to the scope and general allegations of the complaint.

The objection is made that Alice J. McCreary, the sole plaintiff, cannot maintain this action, for the reason that she is not a child, but a grandchild of the testator, and as such not entitled to a distributive share under the will. The third clause of the will does not expressly declare that the division at the death of Mrs. Burns should be among his "children," but as in that clause he speaks of "sons" and "daughters," that was manifestly his intention. The children then living took a vested interest in remainder to be reduced to possession after the death of Mrs. Burns. Sarah Grogan, the mother of Alice, was then living, and took a vested interest in a child's share, which upon her death was transmitted to her only heir, Alice J. McCreary, the plaintiff. *Bentley* v. *Long*, 1 *Strob, Eq.* 43.

It is further said that the plaintiff before her marriage received more than her mother's distributive share of the estate and therefore a recovery upon her part would be inequitable. If true, this is no matter for counter-claim or equitable set-off. It appears that her mother, Sarah Grogan, soon after her marriage died, leaving her an infant, and she was taken by her grandmother and reared in the family. It may be that in this way she enjoyed a support and maintenance furnished by her grandmother, at least in part, from services, which she is now unwilling to have paid out of the *corpus* of the estate; but she lived with her grandmother and Uncle Thomas by invitation, and they cannot now raise that voluntary support into a charge. It is not the province of the court to consider questions of gratitude or moral propriety, but to announce the law.

The statute of limitations is also pleaded. Without going into the general law upon this subject, it is enough to say that as against a remainderman the statute does not begin to run until the death of the life-tenant. Mrs. Burns died in 1876, and this action was brought in 1879. Mrs. McCreary was living with her grandmother in 1870, when the title to the White place was made to Thomas, and she went with her grandmother to live on that land with Thomas, where a short time

after she was married.   There is proof that the matter of the ownership of the land was talked about in the family, she being present; but there is no proof that she ever agreed to or was consulted about the arrangement with Thomas and Robert, or bound herself not to make a claim for a share of the estate. Mere knowledge before the life-estate fell in would not put the statute in motion.

Mrs. McCreary is the sole plaintiff, none of the other remaindermen joining with her in the prayer for partition and account.    On the contrary, it appears that Cyrus Stephens and his wife and probably others were consulted and agreed to the arrangement by which Thomas was paid by having the titles of the White place made to him, and Robert also by having his note paid.   Such of the adult remaindermen as were consulted and agreed to the arrangement aforesaid should not now be allowed to disturb it or receive a part of the estate, when partitioned at the instance of the sole plaintiff, Alice J. Mc-Creary.    An inquiry upon this subject will be included in the order of reference.

After the death of Mrs. Burns the remaindermen stood as to each other as tenants in common, and the account for rents and profits of the land should be stated according to the principles announced in the case of *Jones* v. *Massey*, 14 *S. C.* 307.

The order of reference to the master should be so enlarged as to require him to report whether any of the adult remaindermen consented and agreed to the arrangement by which Robert Burns was paid his note and the White tract of land was conveyed to Thomas Burns, and if so which of them— with leave to report any special matter.

It is the judgment of this court that the judgment of the Circuit Court, except as herein modified, be affirmed.